Bosworth, Ch. J.
The complaint in this action'was dismissed at the trial; and judgment having been perfected, the plaintiff appealed to the General Term.
The ship Joseph Walker, of about 1,300 tons burthen, while lying on the west side of pier Ho. 29, East river, at ■ the-port of Hew York, taking in cargo, took fire, on the 26th of- December,' 1853, and sunk to the bottom. She had on board some 300 or 400 barrels of resin, some 300 bales of cotton, and some 20,000 bushels of wheat, all of which was submerged. The -defendant was insurer of If parts of the ship, other insurance companies, (who are also defendants,) were insurers of the interests of other owners; only 3-2 parts being uninsured, and the owners of those parts are also defendants. The sunken wreck was not ■removed from the slip, until the 25th or 26th of October, 1855. The insured owners' of the vessel abandoned her, after she was burned and sunk, as a total loss, and the insurance companies accepted the abandonment.
The plaintiffs, who are entitled to the wharfage of the ■bulkhead on the west side of this pier, and of the west half of the pier, bring this action to recover by way of damages for the obstruction of the slip, the amount of wharfage they claim to have lost thereby, and also *373 damages for using the pier, and for further obstructing the slip, in efforts to raise and remove the wreck of the vessel, and save whatever could be saved from the wreck. The action was tried on the issues formed by the answer of the Atlantic Mutual Insurance Company; the other defendants having stipulated that the action, as to them, should abide the event of that trial.
The two practical questions presented by this appeal are, (first,) what duty or obligation was imposed on the defendant by accepting this abandonment, and, (second,) whether'it has so failed to perform that duty or discharge that obligation, as to have become liable to pay damages to the plaintiff.
With reference to the first question, it maybe observed, preliminarily, that the ship took fire and sunk, without, any agency or fault of the defendant. She sunk to the bottom, in about 30 feet of water, at medium tide. From the time she. sunk until-she was removed, the plaintiffs expressed no desire to undertake her removal, nor made any objection to the means employed or time occupied in the effort; nor suggested that these means were injudicious or inadequate, nor that the efforts were dilatory or censurably inefficient. The vessel was sunk in an arm of the sea, and became fixed to the bottom, and ceased to be movable as a ship or vessel, by any ordinary means in the course of business or navigation. The results of the efforts made to remove the wreck demonstrates, that it cost more to remove her, than all that was saved, of both vessel and cargo, was worth.
This Court held, when this cause was before it on a demurrer to the original complaint, that "the plaintiffs could not recover, without showing that the defendants, by due care and attention, could have removed the wreck, or, at least, have shifted its position so as to prevent its being a cause of injury, and that they were in default for not having done so. (2 Bosw., 106.) The cases relied upon, as supporting this doctrine, are Brown v. Mallett, (5 M., G. & Scott, 613; S. C., 12 Jur., 204,) Hancock v. *374 The York, New Castle & Berwick R. R. Co., (10 Com. Bench, 348,) and White v. Crisp, (26 L. & Eq. R., 532.) In the first of these cases, it was held, that “ the duty of the defendant, if it exist at all, is of a public nature; and the plaintiff, in order to succeed, must show a breach of public duty, as well as special injury to-himself,” (p. 620.) In the second of these cases, Maule, J., said, that “ the circumstance of the anchor [the vessel] being the defendant’s property, will not of itself render them liable." To have this effect, it must amount to a public nuisance, and a private injury, hy them. The declaration * * * shows about as 'good a cause of action, as if it had stated that somebody beat the plaintiff with the defendants’ stick.”
Creswell, J., said : “ Ho negligence or want of care is imputed to the defendants, either in placing the anchor where it was originally placed, or in allowing it to be removed.”
In White v. Crisp, (supra,) which, like the other two cases, arose on demurrer, the Court, in commenting upon and construing a particular allegation of the complaint, said: “How, we understand by this, that the defendants “ had it in their power, by due care and exertion, to have “ altogether removed this vessel, or to have shifted, at “ least, its position, and so might reasonably have been “ able to prevent the injury. If these words do not mean “ this, we think there was no liability on the part of the “ defendants.” * *
The fourth plea was, that the defendants “had used all “reasonable means for removing the wreck, but were “ unable before the" time when, &c., to do so; and that, by “ reason thereof, before and at the time when, &c., they “ had wholly abandoned and ceased to have any possession of it.” The Court held this plea good, and said it was clear the original owner or the transferee of the wreck may abandon it, and so put an end to his liability.
These cases establish the doctrine, that where a vessel becomes a wreck and sinks in navigable waters, the owner *375 or any transferee may abandon her, and from that time his liability will cease; that he is not under any legal obligation to attempt to remove her. But if, instead of doing that, he retains such possession and control as the thing is susceptible of, he is not liable for any injury occurring while in the exercise of due care and diligence to prevent it; that, so long as he is using all reasonable means to effect a removal, without being able to accomplish it, he is not liable for any damages resulting from the mere fact of its non-removal; and that, although it may be a public nuisance, he cannot, on such a state of facts, be indicted for causing or continuing it.
It would be indeed strange, if a party who was under no legal obligation to remove, or to attempt to remove a wreck, should, because he attempted to remove it, and while using all reasonable means and diligence to accomplish the result, become liable because he had not removed it.
On no principle can a right óf action accrue, in such a ease, for not having removed the wreck, until at -least a sufficient time has elapsed to effect the removal by the use of reasonable means and diligence; and all liability for merely not removing will terminate, when the owner abandons the possession of the wreck and all control of it.
This view of the defendant’s legal duty, makes his liability, if one exist, arise out of his negligence }to use reasonable means and diligence. While using them, and he continues unable to remove the wreck, he is under no liability to pay damages to any one for not having removed it. The plaintiffs’ right, as against the defendant, is commensurate with the duty which the latter owes- to the former. They can maintain no claim against the defendant, except as founded on a duty it owes to him, and a failure to perform that duty.
Kegligence in the use of means to remove the wreck, is not necessarily established by proof that the means first employed were inadequate. If they were such as the best skill and the largest experience selected, in good faith, as *376 adapted to the end to be accomplished, negligence cannot be predicated of their failure.
The most fully considered and best matured plans sometimes prove defective and fail. The best judgments at times form erroneous conclusions, and will continué to do sé, until to err ceases to be human. These misjudgments consist with the utmost caution, care and diligence.
The duty and grounds of the defendant’s liability, if any liability exist, being such as have been stated, we reach the question, whether there is any evidence which would justify a Jury in finding, that the defendant failed to remove the wreck, by reason of negligence in the selection or use of the means employed for that purpose.
Ho Witnesses Were examined on behalf of the defendant. We have, therefore, only to consider evidence given on behalf of the plaintiffs.
Thomas Bell made the first efforts that were made to remove the wreck. He was to have 75 per cent of the net proceeds of all he should raise; and he took entire possession and control of the wreck, in order to raise and remove her. It was" testified that “ he had the best repu- ' tatioti, as a man skillful in this sort of business, of any .man in the United States; he was esteemed the best wrecker in the United States, so far as the witness was acquainted with his reputation. He used the same means that had been successfully employed to raise the “ Great Republic,” a ship of some 4,500 tons, which was sunk the same night as the Joseph Walker, and under similar circumstances.
Ho one except Mr. Mason suggests an opinion or intimation that Mr. Bell had not the skill imputed to him, or that the opinion was entertained, before his efforts proved a failure, that the means employed were not wisely selected, Or were inadequate, or were not vigorously employed. John W. Mason; one of plaintiffs’ witnesses, says he thought, at the time, and told Mr. Bell, that he thought Mr. Bell “got along very slowly”—“That Bell said he was using all the diligence he could, and was getting his *377 arrangements completed for going ahead.” Mr. Mason did not pretend to any experience in the wrecking business, and said he suppled he was not as good a judge in the matter as Mr. Bell, and that he considered it required a skillful man in such business, to remove her.
Junius S. Lewis, another witness on behalf of the plaintiff, testified that he had been a wrecker some eight or ten years, and had raised wrecks from various depths, one being operated upon at a depth of eighty feet below the surface. That he became interested with Bell, in the raising of this wreck, in June, 1854. He details what was done while he was concerned in the operations. In answer to the question whether, “ during the term of your work- “ ing at that wreck, from your commencement with it, “ under Oapt. Bell, and in connection with him, until the “ work was arrested, under Condon, was it prosecuted with “ all the diligence the work admitted of?” He said, “It was, in my judgment. I never used more diligence, and I never knew Mr. Bell more devoted; every man that could be used successfully, or to any value, was brought to the work,” &e., &c. Also, that the suspension of the work from in December,' 1854, into March, 1855, was required by the prudential considerations which lie stated.
Ho one expresses an opinion contrary to that of Mr. Lewis; and Mr. Lewis, on examining Bell’s plan, thought it judicious, and approved of it. When he suspended work in December, 1854, he thought the vessel was in a condition to be removed in a couple of weeks, when the work could be resumed, in the following March.
Somewhere from the first to the middle of March, 1855, Mr. Lewis resumed operations, and was soon arrested in his labors by the city authorities, who then took exclusive possession and control, and thence continued it, until the wreck was removed in October, 1855.
The only other witness who expressed an opinion, in regard to the means used by Bell & Lewis to remove the wreck, is Joseph T. Martin, who testified to the opinion that it could have been removed in January, 1854, by *378 using India rubber camels inflated with gas. But neither before nor since had he known of a vessel of over 300 tons burden, being so raised. That process?after being tried a year and half, was given up.
I do not think a Jury would be justified in finding negligence in the selection or use of means, on such slight evidence as that of Messrs. Mason and Martin, against that of Messrs. Bell & Lewis; or that the evidence, as a whole, justified the submission of any such question to the Jury. It should not be submitted, where the plaintiff’s evidence is equally consistent with the absence as with the existence of negligence in the defendant. (Cotton v. Wood, 8 Com. Bench, N. S., 568.) But the case is not even as strong as that, on the part of the plaintiff.
If this view is correct, then there is no liability resulting from the mere omission to remove the wreck, prior to the time Mr. Lewis was ejected from it.
From that time, neither the defendant nor any one employed by it or with its consent, had any possession or control of the wreck. They all abandoned it, or what is practically the same thing, suffered the city authorities and the persons employed by them, to retain exclusive possession and control.
Mayor Wood’s contract with Walter B. Jones was con-' eluded April 28, 1855, by which Jones was to be paid $13,000 for raising the wreck, and was to have the benefit of any lien or liens on the vessel and cargo.
A reference to the opinions expressed by the witnesses who made efforts to. remove, or applied for contracts to ' remove the wreck, shows that they severally erred in their conclusions as to what they could accomplish; and shows the importance, in disposing of the evidence bearing on the question of negligence, of remembering the wide difference there is between error in judgment and negligence. The event may demonstrate the existence of the power,. and yet not tend to prove the latter.
In the proposition of Martin, dated January 6, 1854, he stated his expectation of being able to raise the wreck in *379 about two weeks, but offered to. contract to remove her, “in all of this.” (that) “month.” He testified that his company could have taken her out “in the month of January.”
Inasmuch as his company never before or since raised a ■vessel of over 300 tons burden,- and abandoned their process about a year and a half after that, and inasmuch as all the efforts made did not result in her removal until, in October, 1855, it cannot be said to be an act of negligence . that the contract was not given to that company. And there is nothing to justify the conclusion, that if it had been given to that company, that the wreck would ever have been removed by the means it proposed to employ.
Mr. Bell does not state in what time he thought he could remove her. But it is evident he expected to accomplish it as. soon as he had placed the canvas in position, and was able to use his pumps.
Mr. Lewis states the opinion, that, by using his plan in the outset, he could • have removed her in about two months. But that he would not have commenced work under it before March, as it could not be safely prosecuted earlier. At the outside, according to his theory, he would have removed her in five months from Jan. 1, 1854.
His plan was adopted in August, 1854. He commenced immediately, and, the last of September, was in readiness ... for efficient operations, and prosecuted them until about the middle of December,' 1854, when the weather became so frosty that he deemed it unsafe to expose his chains to the action of such weather, and suspended operations, supposing that in March, on the return of suitable weather, they could be concluded in about two weeks. What the event would have further demonstrated in regard to his plans and anticipations, had> he been let alofie, is left to conjecture. He was expelled from the wreck in March, 1855, by order of the Mayor of the city. In addition to what he testifies to, as to actual diligence and good faith in his efforts, it was his interest to permit no unnecessary delay/ Heither he nor Bell was to be paid anything if they did'not succeed; and they incurred the expense of *380 keeping vessels over the wreck, and Mr. Wintress, in charge of them during the winter. It was for their interest, if, in the fair exercise of their judgment, enlightened by their long experience in the business, and also in the matter of this wreck, they believed it practicable to continue opera-' tions after the middle of «December, 1854, to have done so.
On the 26th of April, 1855, the contract between Mayor Wood and Walter R. Jones, for the removal of the wreck, was concluded. Jones agreed to remove it “within a, reasonable time,” and states in his contract, that he thinks “the job may be accomplished in sixty days.” This is as long a period as Lewis thought he required, if his plan had been originally adopted.
On the 30th of April, 1855, O. E. Barnes contracted with Walter R. Ives, to remove her in 90 ■ days from .that date. On the 9th of May, 1855, Barnes and Daniel Dodge contracted with Jones to remove her in 90 days from that date.
On the 15th of October, 1855, over five months from that time, Barnes was occupied in taking out cargo, and, in turn, was expelled from the wreck, and excluded by force, from continuing his labors, although he then had it in a position which would have secured its removal in a few days.
Hence, the testimony shows, without contradiction, that from early in January, 1854, until October, 1855, (except-. ing the time that Lewis suspended operations, from, the middle of December, 1854, to March, 1855,) different persons, conversant with business of this kind, and interested to effect the removal, and to effect it with the least practicable delay, were constantly and vigorously occupied, at a great expense to themselves, to accomplish that' object.
There is no giymnd, upon the evidence^ on which the conclusion can be justified, that - it was negligence to attempt the removal by Bell’s plan; or, after that was demonstrated to be insufficient, to pursue the plan of Lewis; or that there was a want of reasonable diligence in pursuing either plan, while the work of removal was prosecuted under it.
*381 From the time of Lewis’ expulsion, and the assumption of possession and control by the Mayor of the city and those who acted under the contracts made with him, there was an actual, an entire abandonment by the defendant of all possession and control, whether real or apparent. The defendant’s liability then ceased, and for any unreasonable delay thereafter, in removing the wreck, the defendant is not liable.
If there be any liability for that, it must be pursued against those who had the possession and control, and used the means, which are alleged, to have been unreasonably inefficient or dilatory.
I think, therefore, that on the evidence there can be no claim against the defendant for damages for not having removed the wreck. And, if this be so, there can be none for the expenses of dredging, «paused by the accumulation of débris,:«deposited by the action of the tides in and about the wreck. Hor is there any for injury to the pier itself.
The plaintiffs’ only witness who spoke to that point, states, that “there was no special damage done to the pier—not to amount to anything—probably fifty dollars would have replaced all that.” There is no specification of any item of damage done to the pier itself, by either Bell or Lewis; nor of their having made any use of it, which obstructed the passing or repassing of carts, or which was in itself wrongful. -
And I cannot think that by force of the contracts with Bell, or between Bell and Lewis, it can be held, that whatever use they made of the pier, was a like use and occupation by the defendant. The latter had no control over their operations and was not an actor in them.
The possession and control of the ship were surrendered ■ to Bell. He undertook the removal, and to do it as best he could. Ho one had any direction to give to him, or undertook to interfere with him in carrying out his plan.
I think the cause was correctly disposed of at the trial, and that the judgment should be affirmed.
*382 Robertson, J.
Two causes of action are set out in the complaint in this case. The first for the occupation of the plaintiffs’ slip or dock by the vessel in question, (Joseph Walker,) while afloat and after she was sunk, and by other vessels employed to refit, float or remove her; this was a quasi contract. The other, for the loss of the wharfage of such slip by the use of various machinery and vessels closing it up, and the sinking of them and the vessel in question in such slip ; which was a species of tort. #
The defendants, in their Answer, besides putting in issue the right of the plaintiffs to the wharfage of the slip in question, and the fact of defendants having kept any vessels or machinery fast to the pier, or that the vessel in question remained fast to the pier, deny two important allegations in the complaint:
I. Any ownership of the vessel after she was burned and sunk, and all acts of ownership thereof by them.» ■
H. The possibility of removing such vessel, within a reasonable period, without unreasonable expense, even by proper means and with due diligence.
The plaintiffs’ claim rests entirely upon the actual ownership of the .wreck by the defendants, or their exercise of acts of ownership over it, the duties thereby devolving'on them, and their mode of discharging such duty.
The question of liability of the owners of a submerged vessel, for injury to other vessels by it, is discussed and passed upon iú White v. Crisp, (10 Exch., 312; S. C., 23 Law J. R., [N. S.,] Ex., 317, and 26 Eng. L. and Eq. R., 532,) and "Brown v. Mallett, (5 M., Gr. & Scott, 613,) but nothing, is said as to any supposed liabilities by implied contracts with third persons. That the Court in those cases did not intend to apply the doctrine laid down by them to contracts is evident from the qualification in the last case of the doctrine laid down in the first, by requiring the sunken vessel, or obstruction, to be a public nuisance in ordpr to make the owner responsible. The first case admits the liability to cease when the possession of the sunken vessel is abandoned; and the duty which is therein *383 charged on the owner is, merely, that if he can, by due care and exertion, shift its position so as to prevent injury by collision, he is bound to do so, although it is out of the way of ordinary navigation.
The reason for the distinction in such case, as to the liability for torts, or on contracts, is obvious. Where a person has power to remove an obstruction from the highway, whether of land or water, when it is valuable to him as a piece of property, and he exercises acts of ownership over it, it is a permissive nuisance to omit to do so, and he is responsible for injury caused by it to others. But' a vessel sunk in a slip, by an unavoidable cause, is a common calamity to both the owners of the slip and the vessel, for which neither is responsible. The waters of the slip are still part of the aquatic highway, on or over which every one has a right to go. The defendants would have had no right to shift the nuisance to another slip, or the channel way, nor were they under any obligations to destroy all the property in it by blowing it up and scattering it, merely because it was an obstruction to the plaintiffs’ profits. They were bound, undoubtedly, not to leave it an unreasonable time there, and were bound to use due diligence in removing the property, or abandoning the ownership .of the wreck. This can be the only reasonable, practical and just rule, where two persons are overtaken by a common calamity, and one seeks to. aggravate or prolong the injury to the other for his own benefit.
The mere occupation of the plaintiffs’ slip by the vessel in question, therefore, did not give them a right of action until it was unreasonably prolonged, whether it were two or fifty years. It is true one of the witnesses, (Lewis,) says he lifted the vessel clear, and could have carried her anywhere; but he does not say he could have carried her to a place of safety; and the defendants had as much right to endeavor to save the cargo in that slip as anywhere else, provided they used due diligence. After such lifting, the labors of the defendants were continued in endeavoring to remove the cargo and lighten the vessel; *384 and it was undoubtedly owing to such labors that the vessel afterwards was so lightened as to be carried off by the employees of a public functionary, as is shown to have been done. It was clearly the duty of the defendants to have used due diligence and proper means for removing the wreck in question in a reasonable time; and this obligation includes .not only the employment of skillful men as instruments, but the adoption by them of proper means, and the prosecution of the work%ith due diligence; but it does not require the utmost diligence or the use of the most rare and successful means ever known by any human being or even of those of which the knowledge was limited to a'few. The -failure of instruments or insufficiency of materials employed, and even delays in carrying on the work, would not amount to a dereliction of duty, if reasonable caution and judgment were exercised in the -selection of such instruments or materials, and no more time was lost than was reasonably necessary to prepare for the work, provide instruments and materials, procure mechanics or scientific persons or workmen to carry on the work, and even to devise new plans in case those previously tried failed. The defendants would, in fine, not be responsible if, after having made proper arrangements for carrying on the work, those arrangements failed without any fault on their, part; they are not to be held to as strict an accountability as if they had taken the risk of all accidents and undertaken to use the utmost diligence, by a contract with the plaintiffs.
In regard to .the testimony respecting the degree of care and judgment practiced in the use of means in this case, it would appear that an experienced man was employed within a short time after the accident, who worked diligently until he left; that when he left, another of equal skill was employed in his place, who continued working diligently until stopped'by cold weather, and in the spring operations were resumed and continued actively, until stopped as before mentioned. The delay or defeat of the enterprise by the bursting of the-canvas first employed to *385 envelope the wreck, was not imputable to the defendants, as it had been originally properly prepared for the purpose, was made of suitable materials, and yielded to some defect not perceptible to outward observation, and the cause of which was only a matter of conjecture.
Assuming the plan of Mr. Lewis to have deserved the praise bestowed by him upon it, and to have been actually superior to that of Captain Bell, yet in the opinion of the latter, who was at least equally experienced, it was not so. It was not, therefore, so clearly the best plan as to have required the defendants to adopt it, even although a Jury might have found it to be the best, if that question had been submitted to them, because there is no evidence that it was generally recognized to be the best, so that a prudent man would have most probably adopted it in his own case. Estimates of witnesses, as to superiority of plans or the" time necessary to raise this vessel, based upon a continuously favorable use of means, without interruption by accidents or neglect of contractors, are wholly inapplicable and unavailable against evidence of actual failure after employing the means and judgment, and using the degree of diligence, required and permitted by law in such case. If no mode had been attempted, such evidence might have been available in determining from what time damages should begin to be estimated, but for that purpose only. Captain Bell agreed to do his work “ with all possible despatch,” and was a competent person; if he failed, the only . obligation on the defendants was to renew their efforts, as long as they claimed property in, and exercised the rights" of owners over the wreck.
Messrs. Martin and Mason are the only witnesses who found fault with the means employed; the first opposed to them a plan of his own, which he had never seen tried on a vessel of anything like the size of the Joseph Walker, and the second admitted he had no experience in wrecking business, and did not know as much as the operator, whose slowness he criticized. Every one employed on the vessel worked diligently, on the plan adopted by him, and there *386 was no evidence, except of the parties so employed, that any one plan used was better than another. Some of them, with diligent working, took more time than their own estimates, although stimulated by the expectation of a large compensation if successful; thus showing the unreliability of such evidence. The last contractor was expelled by force, when he was within two days of reaping the fruits of his labors, as testified to by him, and/the obstruction was removed in a short time afterwards. The utmost, therefore, the plaintiffs could have claimed, would be damages for the delay, not compensation for all the time the vessel was in the slip; but even that claim is unsupported by the testimony. There is evidence of such long, continuous, expensive, judicious, professional, skillful exertions to remove the obstruction, as to raise a strong presumption that everything was done which could reasonably have been demanded, and there is not sufficient evidence to warrant an inference of negligence in the face of the former evidence.
The case was, therefore, properly taken from the consideration of the Jury, and the judgment should be affirmed.
Moncrief, J.
For the purpose of determining this appeal, it must be assumed to be the settled law of this case, “ that when a vessel alongside of a public pier in the City of Hew York, is, accidentally, and without fault of her owner, burned, and sinks to the bottom, near the mouth of the slip or basin, thereby so obstructing the slip and bulkhead as to prevent other vessels coming in; those entitled to the slippage or wharfage, cannot recover for the loss thereof, caused by such obstruction, from the owner of such vessel, without showing that such owner, by due care and attention, could have removed the wreck, or at least have shifted its position so as to prevent its being a cause of injury, and that he is in default for not having done so. That when an insurance company, which has insured an undivided interest in such vessel and has *387 accepted an abandonment made by such insured owner, after the vessel was so burned and sunk, is not liable for loss of slippage or wharfage, caused by such obstruction, it not being alleged that, by due care and attention, it could have been removed. Such piers and bulkheads' are open to the common use of the public, for any purposes connected with the loading, unloading, or repairing of vessels, and securing their cargoes, whether in vessels afloat or sunk, not prohibited by statute or the lawful ordinances of the common council. And such a use, when it neither incumbers the bulkhead or pier, so as to incommode the loading or unloading of vessels, or the passing or repassing of carts, nor in any way injures the structure itself, gives no right of action to the party entitled to slippage and wharf-age. Hence, a use of the slip in attempting to raise the vessel and recover the property in it, especially as such attempt was made at the request of the plaintiffs, creates no liability to make compensation for such use, where there is no evidence showing such use to be wrongful or an invasion of the plaintiffs’ rights, or a violation of any duty which the defendants owed to them.” This was determined at a General Term of this Court, upon the appeal sustaining the demurrer to the original complaint in this action. (2 Bosw., 306.)
The complaint as amended did allege that the wreck, “ the said ship, Joseph Walker, could have been removed with reasonable care, skill and diligence, in a short space of time, to wit, in the space of sixty days from the time when so sunk.” That the defendants, having control and possession of said ship, have conducted themselves so negligently, unskillfully and carelessly, in and about their attempts at the removal of said ship, which they undertook to do, and as was their duty to do, and in and about the bringing into said slip, and sinking or suffering to be sunk and left there of thfe said other vessels or hulks, and in various other acts of negligence, unskillfulness and carelessness in respect thereto, that the plaintiffs have suffered great and lasting injury. That by means, of all *388 which premises, and by said several acts of negligence, nnskillfuliiess and by said other obstructions, brought into said slip by the defendants, and left there, and by injury to the said wharf and pier as aforesaid, and by the said piles driven and left remaining in said slip as aforesaid, and by said obstructions to the passing and repassing of carts upon and over said pier and wharf as aforesaid, and by preventing the entering and loading or unloading of vessels into and alongside said slip, pier and wharf, and by their unnecessary use and occupation of said premises as aforesaid, “ the pier, wharf and slip or basin has been greatly interfered with, and the plaintiffs greatly damaged. " The appellants claim that the action “ is substantially “ for wharfage on the ship Joseph Walker, or for the use “and occupation of the plaintiffs’ premises for not removing her, and obstructing the plaintiffs’ slip and wharf, “ and interfering with their franchise and revenue.”
The only question undisposed of, if any, arises under the amended complaint, alleging that the defendants having undertaken to ■ remove or shift the wreck, have not exercised due care and diligence in not removing the same within the space of sixty days, as with reasonable care, skill and diligence might have been done.
There was no sufficient evidence upon which this could properly be inferred by the Jury in favor of the plaintiffs ; the direction to find for the defendants was therefore correct. (18 N. Y. R., 425.)
It was not suggested in the demand made on behalf of the plaintiffs to go to the Jury, what question if any they should be called upon to pass on; this demand was therefore too broad and comprehensive t'o predicate an exception upon, on a refusal being made. The request to submit questions of fact to a Jury, in analogy to a request to charge the Jury, must be specific, not general. (1 Kern., 61; 2 id., 313; 1 Seld., 422; 3 id., 266; 18 N. Y. R., 558, 565, 566.) To require the submission to a Jury, it is not enough to say that there was some evidence to go to a Jury; there must be evidence upon which they might *389 reasonably and properly conclude that there was negligence on the part of the defendants. (3 Com. Bench, N. S., 146; 8 id., 570, 571.) The evidence introduced, intending to show want of due care, skill and diligence, was all introduced by the plaintiffs; the defendants offered no testimony upon that issue; it must be assumed, therefore, that there is no . conflict of testimony to be examined or explained; there could be no disputed question of fact to pass upon; the contradictions, if any, were caused by the witnesses called and examined on behalf of the plaintiffs. There was, therefore, no disputed fact, and it was the duty of the Oourt to pass upon the question at issue, and determine it in ‘favor of some party; it was a question of law. (2 Hill, 588; 3 Wend., 75.)
The direction in favor of the defendants is abundantly supported by the evidence; it would have been error to refuse it; this Oourt would be compelled to set aside a verdict in favor of the plaintiffs; the proof is overwhelming as to the skill, care and diligence exercised to remove the obstructions.
Again, the direction, to find a verdict for the defendants, could have been put upon the ground, that the defendants were not responsible to the plaintiffs, even if there had been a want of due care, skill, &c.; the contract with Mr. Bell, authorizing him to take possession of the sunken property, with the view to its removal with all reasonable despatch, was made by the owners of the vessel and cargo, Samuel Thompson and nephew, and before the abandonment to the defendants; the latter could exercise no control or direction over Mr. Bell or his servants ; he was not bound to obey or receive the orders of the defendants; while in the performance of this work he was in the exercise of an independent business; the relation of master and servant not existing between the defendants and him who alone could or did cause the injury complained of, the plaintiffs had no cause of action against the defendants. (24 Howard’s U. S. R., 110, 124; 4 Bosw., 140.)
*390 The judgment and the order denying the motion for a nonsuit should be affirmed.
White, J.
I had some hesitation in concurring in the affirmance of the judgment in this action; not because I was disposed to question the legal principles so well stated and reasoned in the opinions already delivered, in favorof affirming the judgment, but because I doubted that, under the facts in this case, those legal principles justified the decisions of the learned Judge, at the trial of the cause. There appeared to me to be some justice in the plaintiffs’ claim for damages or compensation, if the defendants, while occupying the plaintiffs’ dock, were laboring as well for their own profit, in saving the vessel and cargo, as for the public or the plaintiffs’ benefit, in removing the wreck and disencumbering tile slip.
And this view seemed, at first sight, to find support in the testimony of the witness Lewis, where he states that, in the fall of 1854, “he had lifted the vessel so that she might be carried anywhere in the harbor, but that, to make it a sure thing,” he took her further into the slip, and had partially unloaded her, when, fearing the effect of the frost upon the heavy chains by which he held her up, (it being then about the middle of December,) he discontinued operations until the spring, expecting that at that time he would complete the work in a couple of weeks.
This looked, at first, like neglect of duty to the plaintiffs—omitting to remove the vessel out of the slip, when the operator testified “that he might have carried her anywhere in the harbor; ” and it appeared, too, as if the defendants, (or their agents, the wreckers, which is the same thing, in effect,) had ventured on, or assumed the responsibility of this neglect, under the temptation which the state of things then presented—of speedily unloading the vessel and possessing themselves of the cargo, to their own immediate emolument. But further reflection removed this impression. To take the vessel out of the plaintiffs’ slip, *391 and into some suitable location, was the necessity of the case. To take her out of the plaintiffs’ dock and drop her, as an obstruction in the adjacent or other waters of the harbor, would not be a fulfillment by the defendants of the duty which they had assumed to perform, and it is evident that it was apprehension of some such mishap that induced Lewis to lighten the vessel before taking her out of the dock. “To make it,” he says, “a sure thing”—that is, to make the successful removal of the vessel “a sure thing”—he took her further into the dock, to unload and lighten her, but found it necessary, when he had her there, to suspend the work on account of the frost, until the spring. This indicates no negligence or disregard of the plaintiffs’ rights. Even if there were in it an error of judgment, (and it is not shown that there was,) the defendants having committed the work to Lewis, whose ability, skill and experience in business of this character, are proved to be of the firs,t order, they would not be held responsible for an honest error of judgment committed by him in the prosecution of the work. And, except this statement in the testimony of Lewis, and the unsupported and very loose and unreliable opinion or conjecture of one or two unskillful and inexperienced witnesses, there is no evidence whatever upon which a question of neglect could be raised, (and the defendants are only liable for neglect, or want of care,) or upon which any doubt could be suggested that the removal of the obstructions, caused by the sunken wreck, was not, at all times, the object, to the accomplishment of which the efforts of the defendants and their agents were faithfully directed.
To endeavor to save as much as possible of the wreck and cargo, was not incompatible with the entire fulfillment by the defendants of their whole duty to the plaintiffs in this matter; and I do not see that any effort which they made in that direction did interfere with that duty. Ko reasonable plan could be proposed, and no one could, in reason, be required to adopt any plan, for the accomplishment *392 of the expensive and laborious work to be undertaken, that would not embrace the desigu of rendering the wreck and cargo available to defraying, in whole or in part, the necessary expenditures of the work. And if such was the design of the defendants in this instance, it affords no ground for a recovery of damages against them by the plaintiffs; and, besides, there is nothing in the case from which it can be inferred that, if the labor expended was directed solely and exclusively to the removal of the wreck, without any regard to the recovery of the cargo or ship’s materials, the operation would have been more expeditious or successful than it was in reality.
Concurring, then, as I do, in the legal principles to which I have referred in the commencement of this statement, I can see no ground upon which the defendants can be held liable. They were only bound, at the utmost, to exercise due diligence and care; this, I think, they have done. There was no doubtful question in the case, which it was proper or necessary to submit to the Jury, and the direction given to them by the Court, to find a verdict for the defendants, being correct, the judgment should be affirmed, with costs.